## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| HAROLD SEVERANCE, On Behalf of Himself and All Others Similarly Situated and Derivatively on behalf of Nominal Defendant ITC HOLDINGS CORP., | ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) | Case No. |
| v. | ) ) | **CLASS ACTION AND DERIVATIVE COMPLAINT** |
| JOSEPH L. WELCH, ALBERT ERNST, CHRISTOPHER H. FRANKLIN, EDWARD G. JEPSEN, DAVID R. LOPEZ, HAZEL R. O'LEARY, THOMAS G. STEPHENS, G. BENNETT STEWART III, LEE C. STEWART,  FORTIS INC., FORTISUS INC., and ELEMENT ACQUISITION SUB INC., | ) ) ) ) ) ) ) ) ) ) ) ) | **FOR BREACH OF FIDUCIARY DUTIES AND VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |
| Defendants, <br> -and- | ) ) ) ) | |
| ITC HOLDINGS CORP., a Michigan corporation, | ) ) | |
| Nominal Defendant. | | |

Plaintiff Harold Severance ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder class and derivative action brought by Plaintiff on behalf of himself and all other public shareholders of ITC Holdings Corp. ("ITC" or the "Company") against the members of ITC's Board of Directors (the "Board" or "Individual Defendants"), Fortis Inc. ("Fortis") and certain Fortis subsidiaries.  This action arises out of defendants' breaches of their fiduciary duties in connection with the proposed acquisition of the Company by Fortis (the "Proposed Transaction") following an unfair process, in exchange for inadequate consideration, and without disclosing all material information concerning the Proposed Transaction to Company shareholders.

2.      On February 9, 2016, ITC and Fortis issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell ITC to Fortis.  Under the terms of the Merger Agreement, Fortis will acquire all outstanding shares of ITC for the equivalent of $11.3 billion in stock and cash.  Specifically, ITC shareholders will receive 0.7520 shares of Fortis stock and $22.57 per share in cash for each ITC share they own (the "Merger Consideration").  The Merger Consideration is valued at $44.90 per share based on the February 8, 2016 Fortis closing price.

3.      Upon completion of the Proposed Transaction, Fortis shareholders will own approximately 73% of the shares of the combined company and ITC

shareholders will own approximately 27%.

4.     The Proposed Transaction is the product of a hopelessly flawed process that is designed to ensure the sale of ITC to Fortis on terms preferential to defendants and other ITC insiders and will subvert the interests of Plaintiff and the other public shareholders of the Company.  The Proposed Transaction is being driven by ITC insiders, who not only stand to benefit from the accelerated vesting of unvested equity-based awards, but have secured employment with the combined company while ITC's public shareholders will lose control of the Company for inadequate consideration.  Thus, Board members are conflicted and serving their own financial interests rather than those of ITC's other shareholders.

5.     As described below, both the value to ITC shareholders contemplated in the Proposed Transaction and the process by which defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public shareholders of the Company.  The Individual Defendants' conduct constitutes a breach of their fiduciary duties owed to ITC shareholders, and a violation of applicable legal standards governing the Individual Defendants' conduct.

6.     In negotiating the Merger Consideration, the Individual Defendants breached their fiduciary duties by, among other things, failing to negotiate a collar for the stock portion of the Merger Consideration.  As a result, the total Merger

Consideration to be paid to shareholders is subject to the performance of Fortis' publicly traded stock—which has declined since the Proposed Transaction was announced. Additionally, as part of Fortis' financing arrangements for the Proposed Transaction, Fortis will incur debt and sell off a 19.9% stake in ITC to minority investors—thereby diluting the value of the stock portion of the Merger Consideration.

7.      The inadequacy of the Merger Consideration is evidenced by the fact that as recently as February 2, 2016, an analyst at Wunderlich Securities, Inc. ("Wunderlich Securities") set a $45.00 price target for the Company, which is $0.10 above the purported Merger Consideration value stated in the joint press release—providing ITC shareholders with no premium for their valuable shares.

8.      Furthermore, the Board agreed to lock up the deal with a number of coercive deal protection devices in the Merger Agreement, including: (i) a "no-solicitation" clause that prevents the Company from soliciting, and subject to minimal exceptions, from providing non-public information to potential alternate bidders; (ii) an "information rights" provision that requires the Company to promptly advise Fortis of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal; (iii) "matching rights" that allow Fortis three (3) business days to match any superior offer, plus an additional three (3) business day period following

a material amendment to the terms and conditions of a superior offer; and (iv) a provision requiring ITC to pay a termination fee of $245 million if the Company decides to pursue a competing offer.  The collective effect of these provisions is to chill any potential post-deal market check.

9.     Finally, compounding the unfairness of the Proposed Transaction, on March 17, 2016, Fortis filed a Registration Statement on Form F-4 (the "Registration Statement") with the U.S. Securities and Exchange Commission ("SEC").  The Registration Statement, which recommends that ITC shareholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the valuation analyses prepared by the Company's financial advisors, Lazard Frères & Co. ("Lazard"), Barclays Capital Inc. ("Barclays"), and Morgan Stanley & Co. LLC ("Morgan Stanley"), in connection with the rendering of their fairness opinions; (ii) ITC and Fortis management's projections, utilized by Lazard, Barclays, and Morgan Stanley in their financial analyses; and (iii) material information concerning the sale process leading up to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of §§ 14(a) and 20(a) of the U.S. Securities and Exchange Act of 1934 (the "Exchange Act") as shareholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

10.     In short, the Proposed Transaction is designed to unlawfully divest

ITC's public shareholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company shareholders. To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the shareholder vote the Proposed Transaction unless and until such problems are remedied.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the claims asserted herein for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to section 27 of the Exchange Act. The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

12.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. ITC is incorporated in Michigan and is headquartered in this District. Moreover, each of the Individual Defendants, as Company officers or

directors, either reside in this District or have extensive contacts within this District.

## **PARTIES**

14.     Plaintiff Harold Severance is, and has been at all times relevant hereto, a continuous shareholder of ITC.

15.     Nominal defendant ITC is a Michigan corporation with its principal executive offices located at 27175 Energy Way, Novi, Michigan 48377.   The Company is the largest independent electricity transmission company in the United States.   ITC's regulated operating subsidiaries include ITCTransmission, Michigan Electric Transmission Company, ITC Midwest and ITC Great Plains.   The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "ITC."

16.     Defendant Joseph L. Welch ("Welch") has been President, Chief Executive Officer ("CEO") and a director of the Company since it began operations in 2003.   Defendant Welch has been Chairman of the Board since May 2008, and previously served as Treasurer of the Company until April 2009.

17.     Defendant Albert Ernst ("Ernst") has been a director of the Company since August 2014.

18.     Defendant Christopher H. Franklin ("Franklin") has been a director of the Company since August 2011.

19.     Defendant Edward G. Jepsen ("Jepsen") has been a director of the Company since July 2005.

20.     Defendant David R. Lopez ("Lopez") has been a director of the Company since August 2014.

21.     Defendant Hazel R. O'Leary ("O'Leary") has been a director of the Company since July 2007.

22.     Defendant Thomas G. Stephens ("Stephens") has been a director of the Company since November 2012.

23.     Defendant G. Bennett Stewart III ("Stewart III") has been a director of the Company since July 2006.

24.     Defendant Lee C. Stewart ("Stewart") has been a director of the Company since August 2005.

25.     Defendants Welch, Ernst, Franklin, Jepsen, Lopez, O'Leary, Stephens, Stewart III and Stewart are collectively referred to herein as the "Board" or the "Individual Defendants."

26.     Defendant Fortis is a corporation existing under the Corporations Act of Newfoundland and Labrador (Canada) with its principal place of business at Fortis Place, Suite 1100, 5 Springdale Street, St. John's, NL A1B 3T2, Canada. Fortis is an international diversified electric utility holdings company.  Fortis is Canada's largest utility owner, with operations across Alberta, British Columbia,

8

Newfoundland and Labrador, Ontario Prince Edward Island, and abroad.  Fortis' common stock is traded on the Toronto Stock Exchange under the ticker symbol "FTS."

27.     Defendant FortisUS Inc. ("Parent") is a Delaware corporation and a wholly-owned subsidiary of Fortis.

28.     Defendant Element Acquisition Sub Inc. ("Merger Sub") is a Michigan corporation and a direct subsidiary of Parent.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

29.     By reason of the Individual Defendants' positions with the Company as officers and directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of ITC and owe them, as well as the Company, a duty of care, loyalty, good faith, candor and independence.

30.     Under Michigan law, where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders and, if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     Adversely affects the value provided to the corporation's shareholders;

(b)     Favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     Adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporations' shareholders; or

(d)     Will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

31.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     Participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     Participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal benefit not equally shared by the public shareholders of the corporation; or

(c)     Unjustly enriching themselves at the expense of or to the detriment of the public shareholders.

32.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly

violating their fiduciary duties, including their duties of care, loyalty, good faith, candor and independence owed to Plaintiff and the other public shareholders of ITC.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own ITC common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

34.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

35.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  According to the Merger Agreement, as of February 8, 2016, there were 152,720,196 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by ITC or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

36.     Questions of law and fact are common to the Class, including, *inter alia*, the following:

(a)     whether the Individual Defendants breached their fiduciary duties of loyalty, good faith, due care or candor with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b)     whether the process implemented and set forth by the defendants for the Proposed Transaction, including but not limited to, the Merger Agreement, the Proposed Transaction, and the negotiations concerning the Merger Agreement and the Proposed Transaction is entirely fair to the members of the Class;

(c)     whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company and its assets;

(d)     whether defendants have violated sections 14(a) or 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by issuing the materially false and misleading Registration Statement to ITC shareholders;

(e)     whether Plaintiff and the other members of the Class would be irreparably harmed if defendants are not enjoined from effectuating the Proposed Transaction as a result of the wrongful conduct described herein; and

(f)     whether Plaintiff and the Class are entitled to injunctive relief, damages or other relief.

37.     Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and the other members of the Class have sustained damages as a result of defendants' wrongful conduct as alleged.

38.     Plaintiff will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

40.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DERIVATIVE AND DEMAND ALLEGATIONS

41.     Plaintiff was a shareholder of ITC at the time of the acts complained of herein, and remains a shareholder of the Company.

42.     Pursuant to Section 450.1493a of the Michigan Business Corporations Act -- "Shareholder derivative actions; written demands as prerequisite" -- "[a] shareholder may not commence a derivative proceeding until all of the following

have occurred:

(a)     A written demand has been made upon the corporation to take suitable action.

(b)     Ninety days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period."

43.     Pursuant to the Michigan Business Corporations Act, Section 450.1493(a), Plaintiff made a demand upon the current Board prior to commencing his action, informing the Board of the alleged wrongdoers; describing the factual basis for the allegations of wrongdoing; describing how such wrongdoing is harmful to the Company and its public shareholders; and requesting that the Board take remedial action, including without limitation, to ensure that the Proposed Transaction's consideration is fair to ITC and its shareholders.  Plaintiff made his demand on the Board on March 8, 2016.

44.     Plaintiff is not required to wait for a response from the Board. According to the February 9, 2016 joint press release, "[t]he closing of the [Proposed Transaction] is expected to occur in late 2016."  Therefore, "irreparable injury to the corporation would result by waiting."

45.     Plaintiff has, thus, pursuant to Michigan Court Rule 3.502(a), notified

14

the Board of the identity of the alleged wrongdoers who are breaching, and continuing to breach their fiduciary duties in violation of Section 541(a) of the Michigan Business Corporations Act, in detail, and requested that the Board take remedial measures to correct and remedy the alleged wrongdoing. The Board has declined to take action within the time requested in the demand.

46.   Plaintiff is not required to wait 90 days for the Board to respond to the demand to commence this action because, as alleged herein, the Company and its shareholders will be irreparably harmed if the Board is permitted to continue with a sale of the Company pursuant to an unlawful process and unlawful conduct by Defendants.

47.   If Plaintiff were required to wait 90 days to even file the action, there would be insufficient time to engage in the necessary discovery to seek equitable and injunctive relief as to his derivative claims prior to the closing of the merger. Once the Proposed Transaction closes, the harm will be irreparable, as undoing a complex corporate transaction is impossible and damages are difficult to ascertain.

48.   Plaintiff has a sufficient basis to commence his derivative claims without waiting for the 90 day period to run.

49.   Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company and its shareholders will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

**Company Background**

50.     ITC was founded in 1999 as International Transmission Co., a subsidiary of Detroit Edison.  The Company became a publicly traded company in 2005 and is headquartered in Novi, Michigan.  Today, ITC is the largest independent electricity transmission company in the United States.  The Company's regulated operating subsidiaries include ITCTransmission, Michigan Electric Transmission Company, ITC Midwest and ITC Great Plains.

51.     Serving a total peak load over 26,000 MW, the Company owns and operates 15,600 miles of high-voltage transmission lines in Michigan, Iowa, Minnesota, Illinois, Missouri, Kansas and Oklahoma.  ITC also focuses on new areas where significant transmission system improvements are needed through ITC Grid Development and its subsidiaries.

52.     According to the Company's Form 10-K filed with the SEC on February 25, 2016, ITC's business strategic is to own, operate, maintain and invest in transmission infrastructure in order to enhance system integrity and reliability, reduce transmission constraints and allow new generating resources to interconnect to its transmission systems.  The Company pursues development projects intended to improve overall grid reliability, reduce transmission constraints and facilitate interconnections of new generating resources, as well as enhance competitive

wholesale electricity markets.  ITC expects to invest approximately $1.5 billion from 2016 through 2018 through its regulated operating subsidiaries.

53.     As an electric transmission utility with rates regulated by the Federal Energy Regulatory Commission ("FERC"), ITC's regulated operating subsidiaries earn revenues through tariff rates charged for the use of their electric transmission systems by ITC customers, which include investor-owned utilities, municipalities, cooperatives, power marketers and alternative energy suppliers.

**The Inadequate Sale Process**

54.     In March 2015, a representative of a company referred to in the Registration Statement as Party A contacted ITC to arrange a meeting between the CEO of Party A and defendant Welch.  Over the following weeks, Party A and ITC met to discuss Party A's interest in a potential transaction with ITC.

55.     Following Party A's informal interest, members of ITC management met with Barclays and Morgan Stanley in April and June 2015, respectively, to discuss potential strategic alternatives.

56.     On July 21, 2015, the CEO of a company referred to in the Registration Statement as Party B contacted defendant Welch to express interest in a meeting.

57.     Between July 27, 2015 and August 4, 2015, defendant Welch and ITC Senior Vice President and Chief Financial Officer Rejji Hayes ("Hayes") met with

each member of the Board to discuss strategic alternatives and Party A's interest in a potential transaction.

58.    On August 24, 2015, ITC and Party A entered into a non-disclosure agreement ("NDA"), which included a standstill restriction.

59.    On September 29, 2015, Party A's CEO verbally communicated an offer to acquire ITC for $39.00 per share in an all-cash transaction.  During a telephonic Board meeting held that same day, the Board determined not to pursue Party A's proposal at that time.

60.    On October 23, 2015, a representative of Goldman Sachs & Co. ("Goldman Sachs") contacted Hayes to discuss Fortis' interest in a possible acquisition of ITC.  On October 26, 2015, defendant Welch and Fortis President and CEO Barry Perry ("Perry") discussed Fortis' potential interest in a transaction with ITC.  On November 2, 2015, ITC and Fortis entered into an NDA, which included a standstill restriction.

61.    On October 27, 2015, a company referred to in the Registration Statement as Party C contacted ITC to arrange a call with defendant Welch to discuss a potential transaction.  On October 31, 2015, a managing director of Party C and defendant Welch discussed Party C's interest in a transaction with ITC.  On November 5, 2015, ITC and Party C entered into an NDA, which included a standstill restriction.

62.    At a November 3, 2015 Board meeting, the Board instructed management to conduct a process to gauge potential interest from other third parties and authorized management to formally engage financial advisors to assist in the process.  ITC engaged Barclays and Morgan Stanley as financial advisors on November 5, 2015.

63.    On November 6, 2015, ITC management, Barclays and Morgan Stanley discussed, among other things, potential prospective counterparties in connection with a strategic review process.

64.    On November 9, 2015, Barclays and Morgan Stanley contacted only five parties - the four parties that had already expressed interest in the Company (Party A, Party B, Fortis and Party C) and a single new party, a company referred to in the Registration Statement as Party D - to assess their interest in a potential transaction.  The next day Party A declined to participate in the strategic review process for undisclosed reasons.

65.    On November 12, 2015, Fortis submitted a preliminary proposal with an indicative price of $44.25 per share in cash and requested exclusive negotiations with ITC.  The next day, ITC and Party B entered into an NDA, which included a standstill restriction.

66.     Also on November 12, 2015, the Board met with ITC management to review ITC's 2016-2020 financial plan, which the Board authorized to be shared with potential participants in the strategic review process.

67.     On November 21, 2015, ITC granted access to an electronic data room to each party that had previously entered into an NDA with ITC.   Party D subsequently entered into an NDA containing a standstill restriction.

68.     During a November 23, 2015 telephonic Board meeting, the Board determined not to contact additional parties at that time.   On November 30, 2015, Party B indicated it was not in a position to pursue a transaction with ITC.

69.     Also on November 30, 2015, Bloomberg News published an article reporting that ITC was working with financial advisors to conduct a sale process.   In the following weeks, between November 30, 2015 and December 16, 2015, 26 interested parties (including parties referred to in the Registration Statement as Party E and Party F) contacted Barclays and Morgan Stanley to inquire about ITC's strategic review process.   Party E, a financial party, and Party F, a strategic party, indicated interest in a potential transaction.

70.     At a December 2, 2015 Board meeting, Barclays and Morgan Stanley indicated that none of the 26 parties had signed an NDA or formally entered the process.   The Board determined to establish an administrative committee of the Board, consisting of defendants Ernst, O'Leary and Stewart, to assist the Board in

connection with the engagement and interaction with legal and other advisors in connection with the process.

71.    On December 7, 2015, Party D indicated it was not in a position to pursue a transaction with ITC.  Party E entered into an NDA including a standstill restriction on December 10, 2015.  On that same day, ITC made a management presentation to representatives of Party C and Party E.

72.    During a December 17, 2015 telephonic meeting, the Board discussed the strategic review process, including, among other things, hiring a financial advisor that had not previously worked for ITC to advise on the strategic review process. The Board ultimately engaged Lazard to act as its third financial advisor on December 24, 2015.

73.    On December 18, 2015, Party F entered into an NDA with a standstill provision and, later that day, Party C, Party E and Party F (together, the "Consortium") and ITC executed a teaming agreement to allow the Consortium to enter into discussions and arrangements with respect to a potential transaction with ITC.

74.    In connection with the strategic review process, each party was provided with a draft merger agreement and instructed to submit mark-ups of the draft merger agreement by January 5, 2016 and a definitive valuation proposal for a transaction with ITC by January 11, 2016.

75.     Throughout January 2016, ITC and Fortis exchanged mark-ups of draft merger agreements and discussed certain provisions thereof, including certain employee benefits and retention issues.  The Registration Statement does not disclose the details of the employee benefit and retention issues.  Notably, on January 8, 2016, defendant Welch and Hayes requested that Fortis consider modifications to their mark-up to the merger agreement that would provide additional flexibility regarding senior management succession planning.  The Registration Statement does not disclose the details of the modifications requested by defendant Welch and Hayes.

76.     On January 11, 2016, Fortis submitted a proposal to acquire ITC for $44.25 per share in cash (the "January 11 Fortis Proposal").  That same day, the Consortium submitted a proposal to acquire ITC for $37.00 per share in cash.  Later on January 11, Fortis withdrew the January 11 Fortis Proposal and ITC management, in consultation with the Board, decided to extend the deadline of the strategic review process.  Four days later, on January 15, 2016, Fortis submitted a revised proposal to acquire ITC for $41.00 per share in a cash and stock transaction consisting of 54% cash and 46% in Fortis shares.

77.     On January 16, 2016, an undisclosed director of ITC affiliated with a company referred to in the Registration Statement as Party G informed defendant Welch that Party G might be interested in exploring a potential merger, and verbally

expressed an interest in a stock-for-stock transaction with a preliminary valuation of ITC at approximately $45.00 per share.

78.     During the week of January 18, 2016, Barclays and Morgan Stanley requested that Fortis and the Consortium increase the value of their respective proposals and contacted Party A to discuss submitting a revised proposal to acquire ITC.

79.     On January 22, 2016, the Consortium raised its offer to $37.35 per share in an all-cash transaction.  The next day, Party A requested additional information to aid in its evaluation of whether to submit a revised bid.

80.     Following the Board's January 25, 2016 meeting, Barclays and Morgan Stanley contacted Party A, the Consortium, Party G and Fortis to advise that their best and final proposals should be submitted in advance of the Board meeting on February 1, 2016.  On January 26, 2016, Party G expressed interest in an all-stock transaction valued between $39.00 and $42.00 per share.  ITC entered into an NDA with Party G, which included a standstill restriction.  ITC management made a presentation to representatives of Party G on January 29, 2016.  That same day, Party A verbally reaffirmed its all-cash offer to acquire ITC at $39.00 per share.

81.     On February 3, 2016, Fortis delivered a revised proposal to acquire ITC for a combination of cash and Fortis stock consisting of $22.57 in cash and 0.7520 Fortis common shares per ITC share for a total purported value of $44.46 per share.

Later that day, Party G delivered a revised proposal to acquire ITC in an all-stock transaction valuing ITC between $40.00 and $43.00 per share.  Rather than use Fortis' bid as leverage in negotiations with Party G, or push Fortis for a higher price, the Board proceeded to finalize a transaction with Fortis.

82.     Following additional reverse due diligence and discussions between ITC and Fortis concerning termination fees and certain employee benefits and retention matters, on February 8, 2016, the Board met to consider the Proposed Transaction.  Barclays, Morgan Stanley and Lazard presented their financial analyses of each of ITC and Fortis, and compared the Merger Consideration to the proposals from Party A, the Consortium and Party G.

83.     During the February 8, 2016 Board meeting, Party G delivered a revised proposal to acquire ITC in an all-stock transaction valued at approximately $43.25 per share.  Despite Party G's revised proposal, the Board (excluding the undisclosed Board member affiliated with Party G) approved the Merger Agreement and (with defendant Welch abstaining) approved an amendment to defendant Welch's employment agreement that, among other things, provided his employment would become "at will" effective as of December 21, 2016.

**The Proposed Transaction**

84.     On February 9, 2016, ITC entered into the Merger Agreement with Fortis for the inadequate Merger Consideration.  That same day, ITC and Fortis

issued a joint press release stating, in relevant part:

> Fortis Inc. ("Fortis") (TSX: FTS) and ITC Holdings Corp. ("ITC") (NYSE: ITC) announced today that they have entered into an agreement and plan of merger pursuant to which Fortis will acquire ITC in a transaction (the "Acquisition") valued at approximately US$11.3 billion. Under the terms of the transaction ITC shareholders will receive US$22.57 in cash and 0.7520 Fortis shares per ITC share. At yesterday's closing price for Fortis common shares and the US$/C$ exchange rate, the per share consideration represents a premium of 33% over ITC's unaffected closing share price on November 27, 2015 and a 37% premium to the unaffected average closing price over the 30 day period prior to November 27, 2015.

* * *

> Under the terms of the Acquisition, which has been approved by the boards of directors of both companies, ITC shareholders will receive approximately US$6.9 billion in Fortis common shares and cash at closing and Fortis will assume approximately US$4.4 billion of consolidated ITC indebtedness. Upon completion of the Acquisition, ITC will become a subsidiary of Fortis and approximately 27% of the common shares of Fortis will be held by ITC shareholders. Fortis will apply to list its common shares on the New York Stock Exchange ("NYSE") in connection with the Acquisition and will continue to have its shares listed on the Toronto Stock Exchange ("TSX").

* * *

> In addition to the necessary state approvals, the closing of the Acquisition is subject to ITC and Fortis shareholder approvals, the satisfaction of other customary closing conditions, and certain regulatory and federal approvals including, among others, those of the Federal Energy Regulatory Commission ("FERC"), the Committee on Foreign Investment in the United States, and the United States Federal Trade Commission/Department of Justice under the Hart-Scott-Rodino Antitrust Improvement Act. The closing of the Acquisition is expected to occur in late 2016.

25

## The Company's Strong Financial Outlook

85.     The Company has enjoyed strong financial growth over the past several years.  On July 30, 2015, ITC reported its financial results for the second quarter of 2015.  For the quarter, ITC enjoyed net income of $72.3 million, or $0.46 per diluted share, compared to net income of $54.3 million, or $0.34 per diluted share year over year.  Operating earnings for the second quarter were $80.8 million, or $0.52 per diluted common share, compared to operating earnings of $72.7 million, or $0.46 per diluted common share year over year.  The Company reported that it invested $331 million in capital projects during the six month period ended June 30, 2015, including $82.8 million at ITCTransmission, $51.2 million at METC, $182.9 million at ITC Midwest, and $10.0 million at ITC Great Plains.  Commenting on the financial results, ITC Chairman, President and CEO Welch stated:

> We are pleased to report another strong quarter in which we met our operational and financial targets. During the second quarter, we completed the largest project in ITC's history, the Thumb Loop project at ITCTransmission ahead of schedule and under budget, while also delivering operational excellence to our customers and superior growth to our shareholders.

86.     On August 19, 2015, ITC issued a press release announcing that the Board declared a quarterly cash dividend of $0.1875 per share, an increase of approximately 15 % from the previous quarterly rate of $0.1625 per share.  The dividend declaration marked the 10th consecutive year since its initial public offering

26

that ITC had raised the dividend rate on its common stock.  The quarterly cash dividend was payable on September 15, 2015 to shareholders of record on September 1, 2015.  Quarterly cash dividends of $0.1875 were subsequently declared on November 18, 2015 and February 4, 2016.

87.    On October 1, 2015, the Company announced that it entered into an accelerated share repurchase program ("ASR") with Barclays Bank PLC ("Barclays Bank").  The ASR was entered into pursuant to a Board-approved share repurchase program, which authorized the repurchase of up to $250 million of shares through December 31, 2015.  Commenting on the ASR program with Barclays Bank, ITC Chairman, President and CEO defendant Welch stated:

> This program looks to execute up to $115 million of the remaining capacity of share repurchases approved by our board. We remain focused on delivering benefits to customers and creating value for investors, while maintaining the financial strength of the business.

88.    On November 5, 2015, the Company issued a press release announcing its financial results for the third quarter of 2015.  ITC reported net income of $65.6 million, or $0.42 per diluted share, as compared to net income of $73.9 million, or $0.47 per diluted share year over year.  Operating earnings for the third quarter were $82.3 million, or $0.53 per diluted common share, compared to operating earnings of $73.7 million, or $0.47 per diluted common share year over year.  For the nine months ended September 30, 2015, operating earnings were $236.2 million, or $1.51 per diluted common share, compared to operating earnings

of $216.1 million, or $1.36 per diluted common share year over year.  Commenting on the financial results, defendant Welch remarked:

> During the third quarter, we continued to execute on our strategy to invest in critical transmission infrastructure, including base and regional capital, while delivering operational excellence at all of our operating companies. We also remain focused on prudent value return as evidenced by the 15% dividend increase this quarter as well as the $115 million accelerated share repurchase program that will be completed by the end of the year.

89.    On February 25, 2016, the Company issued a press release announcing its financial results for the fourth quarter and year ended 2015.  For the fourth quarter, ITC reported net income of $37.4 million, or $0.24 per diluted share, compared to net income of $46.7 million, or $0.30 per diluted share year over year.  For the year ended December 31, 2015, net income was $242.4 million, or $1.56 per diluted common share, compared to $244.1 million, or $1.54 per diluted common share year over year.  Operating earnings for the fourth quarter were $87.6 million, or $0.57 per diluted common share, compared to operating earnings of $75.9 million, or $0.48 per diluted common share year over year.  For the year ended December 31, 2015, operating earnings were $323.8 million, or $2.08 per diluted common share, compared to operating earnings of $292.0 million, or $1.85 per diluted common share year over year.  Remarking on the financial results, defendant Welch stated:

> I am very pleased to report that 2015 was another year of strong operational and financial performance. We delivered on our

28

commitments to shareholders and customers while positioning ourselves for continued success in the long-term.

90.    ITC has enjoyed higher operating profits despite seeing revenues decline slightly over the past several quarters.  A February 25, 2016 *The Motley Fool* article highlighted the Company making "more from less."  The article elaborated:

> ITC Holdings' fourth-quarter results showed mixed performance. Operating revenues slumped 3% to $224 million, which fell well short of the expectations of most investors. GAAP net income also fell, but operating earnings climbed 15% to $87.6 million, and that worked out to $0.57 per share. That was a penny better than the consensus forecast among those following the stock.
>
> A closer look at ITC's numbers reveals some additional details. The utility said that its revenues would have been $301 million had it not been for reductions of about $77 million associated with various rate refund liabilities. Higher revenue requirements applied because of its larger rate base at regulated subsidiaries, and an increase in cost-sharing revenues came about because more capital projects were included within the regional cost-sharing system.
>
> ITC's cost-containment strategies had some successes, but didn't pan out everywhere. Operation and maintenance costs fell by more than 20%, with about $7 million in savings coming primarily because of reduced needs for vegetation management during the quarter.

## The Proposed Transaction is Inadequate

91.    Given ITC's historic financial performance and future growth potential, the Merger Consideration fails to adequately compensate ITC's shareholders for the intrinsic value of the Company, as well as the significant benefits Fortis will receive from the Proposed Transaction.

92.     Notably, as recently as February 2, 2016, analyst Jay Dobson at Wunderlich Securities set a $45.00 target price for ITC, which is $0.10 above the $44.90 implied value of the Merger Consideration stated in the joint press release.

93.     Further, the Individual Defendants failed to secure an exchange-ratio collar to protect ITC shareholders from a decrease to the already inadequate Merger Consideration.  Thus, the ITC shareholders are at the mercy of the value of Fortis stock at the time the Proposed Transaction is effectuated, which may be affected by numerous factors and therefore have little or no relationship to the value of their ITC shares at that time.  Should there be a major market shift in Fortis stock, the implied value of the Merger Consideration that ITC shareholders will receive for their Company stock will be even lower.  Indeed, following the announcement of the Proposed Transaction, Fortis' stock price dropped by $4.24 to close at $37.14 on February 9, 2016.  Fortis stock has continued to trade well below its pre-announcement price, resulting in a reduction of the implied value of the Merger Consideration.  Additionally, as part of Fortis' financing arrangements for the Proposed Transaction, Fortis will incur debt and sell off a 19.9% stake in ITC to minority investors—thereby diluting the value of the stock portion of the Merger Consideration.

94.     In an article published on February 10, 2016 by *Bloomberg News*, Kellner Management LP fund manager Christopher Pultz stated:  "[t]here was

anticipation of a higher price." The *Bloomberg News* article also noted that shortly after the Proposed Transaction was announced, ITC closed down 1.9% and Fortis shares slid 10% on the Toronto Stock Exchange.

95.     Moreover, the February 9, 2016 joint press release announcing the Proposed Transaction touted the significant benefits to Fortis from the Proposed Transaction, reporting, in pertinent part:

> Following the Acquisition, Fortis will be one of the top 15 North American public utilities ranked by enterprise value, with an estimated enterprise value of C$42 billion (US$30 billion). On a pro forma basis, the consolidated mid year 2016 rate base of Fortis would increase by approximately C$8 billion (US$6 billion) to approximately C$26 billion (US$18 billion), as a result of the Acquisition.
>
> * * *
>
> **Entry into FERC Regulated Transmission**
>
> By acquiring ITC, Fortis is acquiring the largest independent pure-play electric transmission company in the United States. ITC owns and operates high-voltage transmission facilities in Michigan, Iowa, Minnesota, Illinois, Missouri, Kansas and Oklahoma, serving a combined peak load exceeding 26,000 megawatts along approximately 15,600 miles of transmission line. In addition, ITC is a public utility and independent transmission owner in Wisconsin. ITC has grown its average rate base at a compounded average annual rate of approximately 16% over the last three years and, as of September 30, 2015, ITC had assets of US$7.4 billion.
>
> * * *
>
> **Strategic Rationale**
>
> The strategic rationale underlying the transaction includes:

**Accretive Transaction** – The Acquisition aligns with Fortis' financial objectives by providing approximately 5% earnings per common share accretion in the first full year following closing, excluding one-time Acquisition-related expenses. Fortis continues to target 6% average annual dividend growth through 2020.

**Increases Diversification** – The Acquisition represents a singular opportunity for Fortis to significantly diversify its business in terms of regulatory jurisdictions, business risk profile and regional economic mix. Based on the twelve months ended September 30, 2015, pro forma the Acquisition, ITC is expected to represent almost 40% of the consolidated regulated operating earnings of Fortis. The Acquisition will increase the regional economic diversity of Fortis from its current operations in five Canadian provinces, the U.S. states of New York and Arizona, and three Caribbean countries, to include a presence in eight additional U.S. states.

**Supportive FERC Regulation** – ITC's tariff rates are regulated by FERC, which has been one of the most consistently supportive utility regulators in North America providing reasonable returns and equity ratios. Rates are set using a forward-looking rate-setting mechanism with an annual true-up, which provides timely cost recovery and reduces regulatory lag.

**Long-Term Rate Base Growth Prospects** – There is a significant need for capital investment in the aging U.S. electric transmission sector to improve reliability, expand access to power markets, allow new generating resources to interconnect to the transmission system and lower the overall cost of energy delivery. Based on ITC's planned capital expenditure program, ITC's average rate base and construction work in progress ("CWIP") is expected to increase at a compounded average annual rate of approximately 7.5% through 2018.

Clean energy policies in the United States, including renewable portfolio standards, are driving the need for new transmission investment to facilitate the delivery of electricity from renewable energy resources to load-serving entities. In particular, the Clean Power Plan ("CPP") is expected to drive investment in renewables and the retirement of coal-fired generation in the U.S. With its economies of scale and geographic footprint, ITC is favourably positioned to

participate in the significant transmission investment opportunity fostered by the CPP.

**Management Expertise** – The ITC management team has a proven track record of strong EPS growth, total shareholder return, cash flow from operations and operational efficiencies. From its initial public offering in 2005 through November 2015, ITC has delivered more than double the annual shareholder returns of the S&P 500 Utilities Sector Index. ITC's experienced and execution-focused management team will continue to operate independently under the ownership structure of Fortis.

96.     In the joint press release, Fortis President and CEO Perry commented on the benefits Fortis will enjoy as a result of the Proposed Transaction, stating:

Fortis has grown its business through strategic acquisitions that have contributed to strong organic growth over the past decade. Our performance in 2015 is a clear demonstration of the success of this strategy. The acquisition of ITC – a premier pure-play transmission utility – is a continuation of this growth strategy. ITC not only further strengthens and diversifies our business, but it also accelerates our growth.

*  *  *

The acquisition of ITC is in alignment with our business model and acquisition strategy, providing meaningful accretion, and creating a unique, highly diversified, low-risk regulated energy transportation platform . . . . The predictable returns of a transmission business, with no commodity or fuel exposure, are very compelling.

We take a very disciplined approach to acquisitions and are focused on businesses that have experienced management teams, provide geographic diversity in favorable economic regions, and possess significant growth prospects.

97.     In an investor presentation posted to its website on February 9, 2016, Fortis touted the strategic rationale for its acquisition of ITC, as seen in the following

slide:



**The Board Impermissibly Locked Up the Proposed Transaction**

98.      The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving ITC's public shareholders with no meaningful change of control premium for their shares.  When viewed collectively, these provisions, which are detailed below, further the interests of Fortis, certain Individual Defendants and

other ITC insiders to the detriment of ITC's public shareholders and cannot represent a justified, appropriate or proportionate response to any threat posed by a potential third party bidder.

99.     In breach of their fiduciary duties, the Individual Defendants have agreed to the following unreasonable deal protection devices:

- A "no-solicitation" clause that prevents ITC from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 7.1(a));

- An "information rights" provision that requires the Company to promptly advise Fortis of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 7.1(a));

- A "matching rights" provision that allows Fortis three (3) business days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation, plus an additional three (3) business day period following a material amendment to the terms and conditions of a superior offer (Merger Agreement, Section 7.1(d)); and

- A termination fee of $245 million payable by the Company to Fortis if ITC decides to pursue a competing bid (Merger Agreement, Section 9.2).

100.     The "no-solicitation" clause, the "information rights" provision, the

"matching rights" provision, and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

101. The reason behind these deal protection devices is clear: the absence of a meaningful premium for shareholders creates the very real potential that a third party bidder will attempt to usurp Fortis and submit a higher bid for ITC. The possibility that a third-party bidder will emerge motivated Fortis to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Fortis could purchase the Company for less than would otherwise be possible.

102. Taken as a whole, the foregoing deal protection devices and the voting agreements essentially foreclose the possibility that a third-party "white knight" could step forward to provide ITC shareholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction. As such, the deal protection devices and voting agreements, which were approved by the Board as part of and in connection with the Merger Agreement,

represent an ongoing breach of their fiduciary duties.

**Insiders' Interests in the Proposed Transaction**

103.   Fortis and ITC insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public shareholders.  The Board and the Company's executive officers are conflicted and in breach of their fiduciary duties because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public shareholders of ITC.

104.   While ITC's public shareholders are receiving inadequate consideration for their valuable ITC holdings, the Company's directors and officers will achieve a substantial payday.  Pursuant to the Merger Agreement, upon consummation of the merger, ITC's directors and officers will receive cash payments from the immediate vesting of all outstanding stock options, restricted stock units and performance-based awards, whether or not vested - an opportunity that would not otherwise be available.  The following table summarizes the estimated value of the executive officers and non-employee directors' stock options, restricted stock and performance shares:

| | Estimated Value of ITC Stock Options, Restricted Stock and Performance Shares Held by Executive Officers and Non-Employee Directors | | | | | | |
| | Unvested Stock Options | Vested but Unexercised Stock Options | Restricted Stock | Performance Shares at Target Performance | Performance Shares at Maximum Performance | Equivalent Performance Shares | Total (at Target performance) |
|---|---|---|---|---|---|---|---|
| **All Executive Officers as a Group** | $ 5,310,379 | $ 40,163,691 | $ 7,283,997 | $ 4,293,052 | $ 8,586,103 | $ 68,035 | $ 4,361,086 |
| **Non-Employee Director** | | | | | | | |
| Albert Ernst | — | — | $ 133,193 | — | — | — | — |
| Christopher H. Franklin | — | — | $ 290,803 | — | — | — | — |
| Edward G. Jepsen | — | — | $ 290,803 | — | — | — | — |
| David R. Lopez | — | — | $ 133,193 | — | — | — | — |
| Hazel R. O'Leary | — | — | $ 290,803 | — | — | — | — |
| Thomas G. Stephens | — | — | $ 290,803 | — | — | — | — |
| G. Bennett Stewart, III | — | — | $ 290,803 | — | — | — | — |
| Lee C. Stewart | — | — | $ 290,803 | — | — | — | — |
| Total | $ 5,310,379 | $ 40,163,691 | $ 9,295,201 | $ 4,293,052 | $ 8,586,103 | $ 68,035 | $ 4,361,086 |

105.  Further, it appears the Company's executives have secured post-merger employment for themselves with the combined company.  For example, on Fortis' fourth quarter 2015 earnings call on February 18, 2016, Fortis President and CEO Perry stated: "ITC's management team will remain in place and all ITC employees will be retained."  Similarly, according to the Registration Statement, "Fortis does not contemplate terminating any of the named executive officers in connection with the completion of the merger."

106.  Moreover, if they are terminated in connection with the Proposed Transaction, ITC's named executive officers are set to receive substantial cash payments in the form of severance benefits.  All told, defendant Welch and ITC's other named executive officers stand to receive a total of over $33.6 million in golden parachute payments, as detailed in the chart below:

| Name | Cash (US$) [1] | Equity (US$) [2] | Pension / NQDC (US$) [3] | Perquisites/ Benefits (US$) [4] (in US dollars) | Tax Reimbursement (US$) [5] | Other (US$) [6] | Total (US$) [7] |
|---|---|---|---|---|---|---|---|
| Joseph L. Welch | 5,219,607 | 8,149,965 | — | 30,000 | — | — | 13,399,572 |
| Linda H. Blair | 2,751,426 | 3,632,953 | — | 439,652 | — | — | 6,824,031 |
| Rejji P. Hayes | 1,472,919 | 2,276,974 | 63,912 | 53,307 | — | — | 3,867,112 |
| Jon E. Jipping | 2,249,361 | 2,969,990 | — | 53,306 | — | — | 5,272,657 |
| Daniel J. Oginsky | 1,875,440 | 2,382,951 | — | 52,440 | — | — | 4,310,831 |

107.    Therefore, while ITC's public shareholders will lose control of the Company for an unfair price, certain Company insiders will substantially benefit if the Proposed Transaction is consummated—both monetarily and by continuing to enjoy the long term success of the post-transaction company.

**The Registration Statement Contains Numerous Material Misstatements or Omissions**

108.    Compounding the unfair sale process and inadequacy of the Merger Consideration, the defendants also filed the materially incomplete and misleading Registration Statement with the SEC and disseminated it to ITC's shareholders.  The Registration Statement misrepresents or omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote in favor of the Proposed Transaction.

109.    Specifically, as set forth below, the Registration Statement fails to provide Company shareholders with material information or provides them with materially misleading information concerning: (i) the valuation analyses prepared by Lazard, Barclays, and Morgan Stanley in connection with the rendering of their

fairness opinions; (ii) ITC and Fortis management's projections, utilized by Lazard, Barclays, and Morgan Stanley in their financial analyses; and (iii) material information concerning the sale process leading up to the Proposed Transaction. Accordingly, ITC shareholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

110.    The Registration Statement contains written fairness opinions provided by Lazard, Barclays and Morgan Stanley, and describes the various valuation analyses these financial advisors performed in support of their opinions.  However, the descriptions of each financial advisor's opinions and analyses fail to include key inputs and assumptions underlying the analyses.  Without this information, as described below, ITC's public shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinions rendered in support of the Proposed Transaction.

111.    With respect to the *Summary of Lazard['s] Financial Analyses*, the Registration Statement fails to provide a valuation summary detailing the calculation of fully diluted shares, equity value (at the unaffected price and the offer) and enterprise value (at the unaffected price and the offer), as well as any pricing multiples Lazard calculated.

112.    With respect to Lazard's *Selected Comparable Company Multiples Analysis* on pages 76-78, the Registration Statement fails to:

(a)    Disclose the objective selection criteria and display the observed company-by-company pricing multiples and financial metrics examined by Lazard, as well as any other multiples Lazard examined;

(b)    Explain the inconsistency in the use of adjusted EBITDA for ITC whereas unadjusted EBITDA was apparently used in calculating the pricing multiples of the peer companies;

(c)    Explain, in detail, the adjustment made to "equalize" the depreciable life of ITC's asset base, specifically:

    i.    Explain how the EBITDA adjustment was calculated (*i.e.*, the inputs and formula(s) behind the calculation);

    ii.    Explain how Lazard determined that (a) ITC's depreciable life was 52 years, and (b) the peer average was 37 years; and

    iii.    Explain whether each of the comparable companies' EBITDA figures was adjusted to reflect the same average life of 37 years;

(d)    Clarify the assertion that "Lazard averaged the results of these calculation and . . . estimated an implied value range for shares of ITC common stock and an implied value range for Fortis common shares"; and

(e)    Explain how Lazard used the "Implied Fortis Price per Share Range" in its consideration of the fairness of the transaction, including whether Lazard calculated implied exchange ratios and, if so, the details thereof.

113.     With respect to Lazard's *Discounted Cash Flow Analysis* on pages 78-79, the Registration Statement fails to:

(a)     Provide the formula/definition of "free cash flow" used by Lazard;

(b)     Identify the assumptions underlying Lazard's estimate of ITC's and Fortis' respective WACCs, quantify and provide the basis for each assumption, and as appropriate, explain how the Canadian currency influenced Lazard's calculation of Fortis' WACC;

(c)     Disclose the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples;

(d)     Disclose whether the terminal multiples applied on a forward or trailing basis, and if trailing, disclose the basis for such information, including (if pertinent) the trailing multiples examined in the selected companies analyses; and

(e)     Disclose how Lazard used the "Implied Fortis Price per Share Range" in its consideration of the fairness of the transaction, including whether Lazard calculated implied exchange ratios, and if so, the details thereof.

114.     With respect to Lazard's *Selected Precedent Transactions Multiples Analysis* on page 79, the Registration Statement fails to disclose the objective selection criteria and display the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics, as well as any other multiples

(especially EBITDA multiples) or transaction premiums examined.

115.    With respect to the *Research Analyst Price Targets* reviewed by Lazard on page 81, the Registration Statement fails to disclose how Lazard used the range of Fortis price targets in its consideration of the fairness of the transaction, including whether Lazard calculate implied exchange ratios, and if so, the details thereof.

116.    With respect to Lazard's *Dividend Discount Analysis* on page 81, the Registration Statement fails to:

(a)     Disclose how was the terminal value was determined; and

(b)     Identify the assumptions underlying Lazard's estimate of ITC's cost of equity, and quantify and provide the basis for each assumption.

117.    With respect to Lazard's *Infrastructure Returns Analysis* on page 81, the Registration Statement fails to:

(a)     Describe this unconventional analysis in detail, and provide underlying assumptions;

(b)     Specify how the terminal P/E multiples were applied - whether on a trailing basis, forward basis, or some other basis;

(c)     Explain why a cost-of-equity range of 9%-12% was used, as compared to the 6%-6.5% range used in the *Dividend Discount Analysis*, and identify, quantify and source the cost of equity assumptions; and

(d)     Indicate the basis for the assumed 10.5% ratio of funds from

operations to debt.

118.    With respect to Lazard's *Discounted Cash Flow Sensitivity Analysis* on page 82, the Registration Statement fails to disclose the free cash flow and the free cash flow calculations associated with ITC's projects in Puerto Rico and Mexico.

119.    With respect to the *Miscellaneous* section concerning the financial analyses of Lazard on page 82, the Registration Statement is materially deficient in that it fails to disclose: (i) the basis on which the Board may, in its discretion, pay Lazard an additional fee of up to $2 million; and (ii) the prior services rendered by Lazard to ITC over the two-year period preceding the announcement of the Proposed Transaction as well as the fees received in connection with the rendering of such service(s).

120.    With respect to Barclays' review and analysis of "the relative contributions of ITC and Fortis to the historical and future financial performance of the combined company on a pro forma basis," noted on page 84, the Registration Statement fails to disclose the results of Barclays' relative contributions analysis, as well as any similar analyses performed by Lazard or Morgan Stanley.

121.    With respect to the "future capital investments by ITC in Mexico and Puerto Rico" noted on page 85, the Registration Statement fails to describe and discuss the investments in Mexico and Puerto Rico, and the reasons why Barclays did not consider the potential financial impact of these opportunities.

122.     With respect to Barclays' *Standalone Valuation of ITC*, the Registration Statement fails to provide a valuation summary detailing the calculation of fully diluted shares, equity value (at the unaffected price and the offer) and enterprise value (at the unaffected price and the offer), as well as any pricing multiples Barclays calculated.

123.     With respect to Barclays' *Selected Comparable Company Analysis* of ITC on page 87, the Registration Statement fails to disclose the objective selection criteria used and display the observed company-by-company pricing multiples and financial metrics (especially those related to "sizes, growth prospects, profitability levels," etc. referenced by Barclays as important) examined by Barclays, as well as any other multiples Barclays examined, and the details thereof.

124.     With respect to Barclays' *Selected Precedent Transactions Analysis* on page 88, the Registration Statement fails to:

(a)     Disclose the objective selection criteria used and display the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics, as well as any other multiples or transaction premiums examined, and the details thereof;

(b)     Indicate the source of the "rate base" metric examined in this analysis; and

(c)     Disclose why the "rate base" metric was examined in this

analysis, and not in Barclays' *Selected Comparable Company Analysis*.

125.   With respect to Barclays' *Discounted Cash Flow Analysis* of ITC on page 89, the Registration Statement fails to:

(a)   Disclose the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples; and

(b)   Identify the assumptions underlying Barclays' estimate of ITC's WACC, and quantify and provide the basis for each assumption.

126.   With respect to Barclays' *Discounted Future Stock Price Analysis* of ITC on page 89, the Registration Statement fails to identify the assumptions underlying Barclays' estimate of ITC's cost of equity and quantify and provide the basis for each assumption.

127.   With respect to Barclays' *Standalone Valuation Analysis of Fortis* on page 90, the Registration Statement fails to provide a valuation summary detailing the calculation of fully diluted shares, equity value (at the unaffected price) and enterprise value (at the unaffected price), as well as any pricing multiples Barclays calculated.

128.   With respect to Barclays' *Analyst Price Targets Analysis* on page 90, the Registration Statement fails to disclose how Barclays used the range of Fortis price targets in its consideration of the fairness of the transaction, including whether Barclays calculated implied exchange ratios, and if so, the details thereof.

129.    With respect to Barclays' *Selected Comparable Company Analysis* of Fortis on pages 90-91, the Registration Statement fails to:

(a)    Disclose the objective selection criteria and display the observed company-by-company pricing multiples and financial metrics (especially those related to "sizes, growth prospects, profitability levels," etc. referenced by Barclays as important) examined by Barclays, as well as any other multiples Barclays examined; and

(b)    Disclose whether the column heading in the table on page 91 should read "Implied Value Per Share of <u>Fortis</u> Common Stock" rather than ITC common stock.

130.    With respect to Barclays' *Discounted Cash Flow Analysis* of Fortis on page 91, the Registration Statement fails to:

(a)    Disclose the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples;

(b)    Identify the assumptions underlying Barclays' estimate of Fortis' WACC, quantify and provide the basis for each assumption, and as appropriate, explain how the Canadian currency influenced Barclays' calculation of Fortis' WACC; and

(c)    Disclose how Barclays used the range of Fortis indicated values in its consideration of the fairness of the transaction, including whether Barclays

calculated implied exchange ratios, and if so, the details thereof.

131.    With respect to the *General* section concerning the financial valuation analyses of Barclays on page 92 of the Registration Statement, the Registration Statement discloses that Barclays' "[t]otal compensation of approximately US$20.7 million, including the Opinion Fee, which we refer to as the Transaction Fee, will become payable by ITC to Barclays in connection with the merger in installments, with a portion due and payable upon the announcement of the merger, an additional portion will be due and payable upon approval of the merger by ITC shareholders, with the remaining substantial portion due and payable upon consummation of the merger." The Registration Statement is materially deficient in that it fails to disclose how much of the Transaction Fee will become due and payable to Barclays in connection with each of the three installments.

132.    With respect to Morgan Stanley's *ITC Financial Analysis* on page 94, the Registration Statement fails to provide a valuation summary detailing the calculation of fully diluted shares, equity value (at the unaffected price and the offer) and enterprise value (at the unaffected price and the offer), as well as any pricing multiples Morgan Stanley calculated.

133.    With respect to Morgan Stanley's *Comparable Public Companies Analysis* of ITC on page 95, the Registration Statement fails to disclose the objective selection criteria and display the observed company-by-company pricing multiples

and financial metrics (especially those related to "revenue and/or revenue growth rates" etc. referenced by Morgan Stanley as important) examined by Morgan Stanley, as well as any other multiples Morgan Stanley examined (especially trailing P/E multiples, which were used elsewhere in Morgan Stanley's analysis).

134.    With respect to Morgan Stanley's *Discounted Cash Flow Analysis* of ITC on pages 96-97, the Registration Statement fails to:

(a)    Disclose the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples; and

(b)    Identify the assumptions underlying Morgan Stanley's estimate of ITC's WACC and quantify and provide the basis for each assumption.

135.    With respect to Morgan Stanley's *Analysis of Selected Precedent Transactions and Premiums Paid* on page 97, the Registration Statement fails to:

(a)    Disclose the objective selection criteria and display the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics, as well as any other multiples or transaction premiums Morgan Stanley examined; and

(b)    Clarify which P/E multiples were examined.

136.    With respect to Morgan Stanley's *Fortis Financial Analysis* on page 98, the Registration Statement fails to provide a valuation summary detailing the calculation of fully diluted shares, equity value (at the unaffected price) and

enterprise value (at the unaffected price), as well as any pricing multiples Morgan Stanley calculated.

137.    With respect to Morgan Stanley's *Equity Research Analysts' Price Targets* for Fortis on page 98, the Registration Statement fails to:

(a)    Identify the assumptions underlying Morgan Stanley's estimate of ITC's cost of equity, and quantify and provide the basis for each assumption; and

(b)    Disclose how Morgan Stanley used the range of Fortis price targets in its consideration of the fairness of the transaction, including whether Morgan Stanley calculated implied exchange ratios (as it did with certain other analyses as shown on page 100), and if so, the details thereof.

138.    With respect to Morgan Stanley's *Selected Companies Analysis* for Fortis on page 98, the Registration Statement fails to disclose the objective selection criteria and display the observed company-by-company pricing multiples and financial metrics (especially those related to "revenue and/or revenue growth rates" etc. referenced by Morgan Stanley as important) examined by Morgan Stanley as well as any other multiples Morgan Stanley examined (especially trailing P/E multiples, which were used elsewhere in Morgan Stanley's analysis).

139.    With respect to Morgan Stanley's *Discounted Cash Flow Analysis* for Fortis on page 99, the Registration Statement fails to:

(a)    Disclose the implied perpetuity growth rates corresponding to

the assumed terminal pricing multiples; and

(b)     Identify the assumptions underlying Morgan Stanley's estimate of Fortis' WACC, quantify and provide the basis for each assumption, and as appropriate, explain how the Canadian currency influenced Morgan Stanley's calculation of Fortis' WACC.

140.   With respect to Morgan Stanley's *Pro Forma Transaction Analysis* on page 100, the Registration Statement fails to quantify the accretion as determined by Morgan Stanley.

141.   The Registration Statement is false or misleading due to the omissions identified in ¶¶ 111-140 as, without such undisclosed information, Company shareholders cannot evaluate for themselves whether the financial analyses performed by Lazard, Barclays and Morgan Stanley were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, shareholders require this information in order to fully evaluate the extent to which Lazard, Barclays and Morgan Stanley's opinions and analyses should factor into their respective decision whether to vote in favor of the Proposed Transaction.

142.   Additionally, the Registration Statement does not disclose material information concerning ITC and Fortis management's financial projections.

51

143.    The Registration Statement fails to disclose the ITC Management Projections on page 104, provided by ITC management, which were relied upon by Lazard, Barclays and Morgan Stanley for purposes of their analyses, for years 2016-2020, for the following items: (i) unlevered free cash flows, (ii) reconciliation of GAAP net income to non-GAAP UFCF and non-GAAP EBITDA/Adjusted EBITDA, (iii) adjusted EBITDA (as referred to by Lazard on pages 77 and 78), if different from EBITDA, and if not different providing clarification as appropriate, and (iv) dividends.  In addition, the Registration Statement fails to disclose whether Net Income and Diluted Earnings Per Share are calculated consistently, and if not, the differences.

144.    This information is integral to shareholders' evaluation of the Merger Consideration.  Indeed, these financial projections provide a sneak peek into ITC's expected future performance (*i.e.*, growth/profitability) and, consequently, its value as a standalone entity.  More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the Company.  Accordingly, it is no surprise that financial projections are among the most highly sought after disclosures by shareholders in the context of corporate transactions such as this.

145.    Similarly, on page 105, the Registration Statement fails to disclose the

projections provided by Fortis management, which were relied upon by Lazard, Barclays and Morgan Stanley for purposes of their analyses, for years 2016-2020, for the following items: (i) capital investments; (ii) average rate base and CWIP; (iii) unlevered free cash flows; (iv) reconciliation of GAAP net income to non-GAAP UFCF and non-GAAP EBITDA/Adjusted EBITDA; (v) adjusted EBITDA (as referred to by Lazard on pages 77 and 78), if different from EBITDA, and (vi) dividends.  In addition, the Registration Statement fails to quantify the effect of the Proposed Transaction on Fortis' projections, including assumptions as necessary/appropriate.

146.   Finally, with respect to the sale process that led to the Proposed Transaction, the *Background of the Merger* section contained on pages 52-63 of the Registration Statement is materially deficient in that it fails to disclose:

(a)   The reasons why the Board failed to pursue opportunities and alternatives reviewed following the termination of a potential business combination with Entergy Corp., including but not limited to "remaining as a stand-alone entity, potential acquisitions of other companies, share repurchases (including those pursuant to the share repurchase programs authorized in 2014 and 2015), corporate structural alternatives, business combinations and other strategic transactions";

(b)   The reasons why the Board chose to engage three financial advisors in connection with the Proposed Transaction;

(c)    The reasons why the Board did not instruct the Company's financial advisors to conduct an outreach to gauge market interest in the Company prior to November 2015, despite ongoing talks with several interested potential counterparties;

(d)    The actions taken, if any, by Barclays and Morgan Stanley to determine there were no credible parties to contact about a potential acquisition of the Company beyond Fortis and Parties A, B, C and D on November 5, 2015;

(e)    The reasons, if communicated to the Board or management, as to why Party D was not in a position to pursue a transaction with Party C involving ITC;

(f)    The basis and rationale for the Board's support of a fixed exchange ratio as part of the Merger Consideration;

(g)    The details of the modifications defendant Welch and Hayes discussed with Perry on January 8, 2016 with respect to providing additional flexibility regarding senior management succession planning;

(h)    The details of Party G's revised proposal delivered on February 8, 2016, including whether the revised proposal contained a collar provision, and the basis for the Board's determination at its February 8, 2016 Board meeting "that the multiples of earnings at which ITC is valued and multiple of earnings at which companies in the industry in which Party G operated are valued would likely result

in substantial degradation in value for ITC shareholders if the two companies were combined, and that there was a substantial risk that Fortis would abandon its pursuit of ITC, or adversely change the terms of its proposal, were ITC to delay the process for the period of time that Party G indicated it would require to finalize its proposal;" and

(i)     Any and all information regarding any discussions that likely took place pertaining to the possible continued employment of defendant Welch , or any other ITC officers, directors, or employees following a strategic transaction, including, but not limited to the timing, content, communications, parties, and form of such an indication.  Although the Registration Statement discloses a letter agreement between defendant Welch and ITC (the "Welch Letter Agreement"), pursuant to which, effective December 21, 2016, defendant Welch's employment will be "at-will," the Registration Statement fails to disclose any arrangements between Fortis and defendant Welch or any of ITC's executives.  Given that Fortis President and CEO Perry stated on Fortis' February 18, 2016 fourth quarter 2015 earnings call that "ITC's management team will remain in place and all ITC employees will be retained," the Registration Statement is incomplete and misleading.  Indeed, the Registration Statement states on page 112 that "[a]s of the date of the proxy statement, other than the arrangements discussed in this proxy statement, none of ITC's executive officers has entered into any agreement with Fortis regarding

employment with, or compensation from, the surviving corporation or Fortis following the completion of the merger." However, on page 113 the Registration Statement states: "Fortis does not contemplate terminating any of the named executive officers in connection with the completion of the merger."

147.    Defendants' failure to provide ITC shareholders with the foregoing material information constitutes a violation of sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Registration Statement. Absent disclosure of the foregoing material information prior to the shareholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

148.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of ITC's assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.

149.    Unless enjoined by this Court, the Individual Defendants will continue

to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

150.    Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

## CLAIMS FOR RELIEF

## COUNT I

### Class Claims Against All Individual Defendants for Breach of Fiduciary Duties

151.    Plaintiff repeats all previous allegations as if set forth in full.

152.    The Individual Defendants have violated the fiduciary duties of due care, loyalty, good faith, candor and independence owed to the public shareholders of ITC and have acted to put their personal interests ahead of the interests of ITC shareholders or acquiesced in those actions by fellow Individual Defendants. The Individual Defendants have failed to take adequate measures to ensure that the interests of ITC's shareholders are properly protected and have embarked on a process that avoids competitive bidding and provides Fortis with an unfair advantage by effectively excluding other alternative proposals.

153.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, will unfairly deprive Plaintiff and the other members of the Class of the true value of their ITC investment. Plaintiff and the other members of the Class will suffer

irreparable harm unless the actions of these defendants are enjoined and a fair process is substituted.  These harmful acts include, *inter alia*, agreeing to the $245 million dollar termination fee, as well as agreeing to the restrictive no-solicitation, information rights, and matching rights provisions contained in the Merger Agreement.  In addition, the Board failed to provide ITC shareholders with material information necessary for them to make an informed decision regarding whether to vote in favor of the Proposed Transaction.

154.    Because the Individual Defendants dominate and control the business and corporate affairs of ITC, and had access to private corporate information concerning the Company's assets, business and future prospects, there was an imbalance and disparity of knowledge and economic power that existed between them and ITC's public shareholders which makes it inherently unfair for the Individual Defendants to pursue and recommend any transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

155.    The Individual Defendants have breached their duties of loyalty, good faith, due care, candor and independence by not taking adequate measures to ensure that the interests of ITC's public shareholders are properly protected from overreaching by Fortis and failing to provide ITC shareholders with material information concerning the Proposed Transaction.

156.    By reason of the foregoing acts, practices, and courses of conduct, the

Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

157.    The Individual Defendants engaged in self-dealing, did not act in good faith toward Plaintiff and the other members of the Class, and breached their fiduciary duties to Plaintiff and the other members of the Class.

158.    As a result of the actions of the Individual Defendants, Plaintiff and the Class have been, and will be, irreparably harmed in that they have not, and will not, receive full and fair value for their ownership interest in ITC's stock and businesses.

159.    Plaintiff and members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which these actions threaten to inflict.

## COUNT II

### Class Claims Against All Defendants for Aiding and Abetting the Board's Breaches of Fiduciary Duty

160.    Plaintiff repeats all previous allegations as if set forth in full.

161.    Defendants Fortis, Parent and Merger Sub knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.

162.    As a result of this misconduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented

from obtaining a fair price for their ITC shares.

163.    Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT III

### Derivatively on Behalf of ITC for Breach of Fiduciary Duties
### Against the Individual Defendants

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

165.    Plaintiff brings this claim derivatively on behalf of ITC.

166.    The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to the Company and have acted to put their personal interests ahead of the interests of ITC.

167.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duty of loyalty owed to ITC because, among other reasons:

        (a)     they failed to take steps to maximize the value of ITC; and

        (b)     they failed to properly value ITC and its assets and operations.

168.    Because the Individual Defendants are in possession of private corporate information concerning ITC's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of ITC which makes it inherently unfair for them to pursue and merger wherein they wherein they will reap disproportionate benefits to

the exclusion of maximizing shareholder value.

169.    By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward ITC.

170.    The Individual Defendants are engaging in self-dealing, are not acting in good faith toward ITC, and have breached and are breaching the fiduciary duties owed to ITC.

171.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to the Company, and may consummate the Proposed Transaction without providing the Company and its shareholders a full and fair sale process.

172.    As a result of the Individual Defendants' actions, the Company has and will be irreparably harmed.

173.    The Company has no adequate remedy at law.

## COUNT IV

### Derivatively on Behalf of ITC for Aiding and Abetting the Board's Breaches of Fiduciary Duties Against Fortis, Parent and Merger Sub

174.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

175.    Plaintiff brings this claim derivatively on behalf of ITC.

176.    Defendants Fortis, Parent and Merger Sub are well aware that the

Individual Defendants have not sought, and are not seeking, to obtain the best possible transaction for the Company's public shareholders.

177.    As alleged in more detail above, Fortis, Parent and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties by causing the Board members to accept inadequate consideration for the Company's public shareholders and negotiating unreasonably preclusive deal protection terms.

178.    As a result, ITC has been and will be irreparably harmed.

179.    ITC has no adequate remedy at law.

## COUNT V

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

180.    Plaintiff repeats all previous allegations as if set forth in full.

181.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

182.    During the relevant period, defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of section14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

183.   By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Registration Statement.  The Registration Statement was prepared, reviewed, and/or disseminated by the defendants.  The Registration Statement misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's and Fortis' assets.  The defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.  The defendants have also failed to correct the Registration Statement and the failure to update and correct false statements is also a violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

184.   The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to shareholders.

185.    By reason of the foregoing, the defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

186.    Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT VI

### Class Claims Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

187.    Plaintiff repeats all previous allegations as if set forth in full.

188.    The Individual Defendants acted as controlling persons of ITC within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of ITC and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

189.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and

had the ability to prevent the issuance of the statements or cause the statements to be corrected.

190.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

191.   In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Registration Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

192.   By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

## COUNT VII

**Derivative Claim Against All Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

193.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

194.   Plaintiff brings this claim derivatively on behalf of ITC.

195.   During the relevant period, defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

196.   By virtue of their position within the Company, defendants were aware of this information and of their duty to disclose this information in the Registration Statement.  The Registration Statement was prepared, reviewed, and disseminated by defendants.  It misrepresented or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company and its assets.  Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

197.   The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view full and accurate disclosures as significantly altering the "total mix" of information made available to them in connection with the decision whether to approve the Proposed Transaction.

198.     By reason of the foregoing, defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

199.     Because of the false and misleading statements in the Registration Statement, the Company is threatened with irreparable harm and with the interference of proper governance on its behalf that follows the free and informed exercise of the shareholders' right to make an informed vote regarding a corporate merger.  Therefore injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT VIII

### Derivative Claim Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

200.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

201.     Plaintiff brings this claim derivatively on behalf of ITC.

202.     The Individual Defendants acted as controlling persons of ITC within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of ITC and participation in or awareness of the Company's operations and intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements

which Plaintiff contends are false and misleading.

203.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

204.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations as alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.

205.    They were, thus, directly involved in the making of this document.  In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Registration Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the directors.

206.    By virtue of the foregoing, the Individual Defendants have violated

section 20(a) of the Exchange Act.

207.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) of the Exchange Act and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, the Company and the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of ITC, and against defendants, as follows:

A.    Declaring that Counts 1, 2, 5 and 6 are properly maintainable as a class action;

B.    Declaring that Counts 3, 4, 7 and 8 are properly maintainable as a derivative action, and that Plaintiff is an adequate representative of the Company;

C.    Declaring and decreeing that the Merger Agreement was entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

D.      Rescinding, to the extent already implemented, the Merger Agreement agreed to in connection with the Proposed Transaction;

E.      Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction and any vote on the Proposed Transaction, unless and until they comply with their obligations under sections 14(a) and 20(a) of the Exchange Act to provide shareholders with all material information concerning the Proposed Transaction, and adequately undertake all appropriate and available methods to maximize shareholder value and remove any conflict of interest that has clouded the process and the Individual Defendants' judgment;

F.      Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct;

G.      In the event that the Proposed Transaction is consummated, rescinding the merger, and awarding Plaintiff and the Class compensatory damages and rescissory damages;

H.      Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for Plaintiff's attorneys' fees, expenses and experts' fees; and

I.      Granting such other and further relief as this Court may deem to be just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: April 8, 2016                      **WERNETTE HEILMAN PLLC**

                                      /s/ Michael R. Wernette
                                        MICHAEL R. WERNETTE (P55659)
                                        Local counsel for Plaintiff
                                        24725 W. 12 Mile Road
                                        Suite 110
                                        Southfield, Michigan 48034
                                        (248) 663-5170
                                        mike@wernetteheilman.com

                                        **WEISSLAW LLP**
                                        Richard A. Acocelli
                                        Michael A. Rogovin
                                        Kelly C. Keenan
                                        Counsel for Plaintiff
                                        1500 Broadway, 16th Floor
                                        New York, New York 10036
                                        (212) 682-3025

# EXHIBIT 1

## <u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

The undersigned certifies as follows:

1. The undersigned has reviewed the complaint filed against ITC Holdings Corp. ("ITC") and others and would authorize the filing thereof, if necessary.

2. The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3. The undersigned is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. The undersigned's purchases and sales of ITC common stock during the class period are reflected in the attached Addendum.

5. The undersigned has not sought to serve or served as a class representative under the federal securities laws in the last three years, other than listed below (if any):


6. The undersigned will not accept any payment for serving as a representative party beyond the undersigned's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

DATED: 04/06/2016

_____
Harold Severance

# WEISSLAW LLP

16th Floor
1500 Broadway
New York, New York 10036
TEL. (212) 682-3025
FAX (212) 682-3010

New York . Los Angeles

March 8, 2016

**VIA FedEx and Email**

Board of Directors
ITC HOLDINGS CORP.
c/o Christine Soneral
Senior Vice President and General Counsel
27175 Energy Way
Novi, Michigan 48377
Email: csoneral@itctransco.com

Re: Shareholder Demand of Harold Severance

To the Board of Directors of ITC Holdings Corp.:

We represent Harold Severance, a shareholder of ITC Holdings Corp. ("ITC" or the "Company") at all times relevant herein. This letter is written on behalf of Mr. Severance to you the Board of Directors of ITC (the "Board" or "You") in connection with Fortis Inc.'s ("Fortis") attempt to acquire the Company. We demand on behalf of Mr. Severance that ITC and You remedy your violations of Michigan law, including breaches of fiduciary duties that have caused, and threaten to cause further, substantial damage to ITC and its shareholders. We demand on behalf of Mr. Severance that You take the actions described herein.

As You know, ITC and Fortis announced their entry into an Agreement and Plan of Merger ("Merger Agreement") on February 9, 2016, pursuant to which Fortis will acquire ITC in a transaction purportedly valued at $11.3 billion (the "Proposed Transaction"). Under the terms of the Merger Agreement, ITC shareholders will receive 0.7520 Fortis shares and $22.57 in cash for each share of ITC common stock they own, valued at $44.90 per ITC share based on the February 8, 2016 Fortis stock closing price (the "Merger Consideration"). The Proposed Transaction is expected to close in late 2016.

As described below, the Proposed Transaction is the result of a flawed process that fails to maximize the value of ITC stock for the benefit of the Company's public shareholders and is fundamentally unfair to ITC, Mr. Severance and the other public shareholders of the Company.

Board of Directors
ITC Holdings Corp.
March 8, 2016
Page 2

The Board owes fiduciary duties of care, loyalty, candor and good faith to ITC and its shareholders. In entering into the materially deficient Merger Agreement, the Board violated and continues to violate applicable law by directly breaching its fiduciary duties. The Board's conduct has caused and will continue to cause serious damage to ITC and its shareholders.

The Merger Consideration contemplated by the Merger Agreement is inadequate given ITC's historical financial performance and future growth potential.

The Company has enjoyed strong financial growth over the past several years. On July 30, 2015, ITC reported its financial results for the second quarter of 2015. For the quarter, ITC enjoyed net income of $72.3 million, or $0.46 per diluted share, compared to net income of $54.3 million, or $0.34 per diluted share year over year. Operating earnings for the second quarter were $80.8 million, or $0.52 per diluted common share, compared to operating earnings of $72.7 million, or $0.46 per diluted common share year over year. The Company reported that it invested $331 million in capital projects during the six month period ended June 30, 2015, including $82.8 million at ITCTransmission, $51.2 million at METC, $182.9 million at ITC Midwest, and $10.0 million at ITC Great Plains. Commenting on the financial results, ITC Chairman, President and Chief Executive Officer ("CEO") Joseph L. Welch ("Welch") stated:

> We are pleased to report another strong quarter in which we met our operational and financial targets. During the second quarter, we completed the largest project in ITC's history, the Thumb Loop project at ITCTransmission ahead of schedule and under budget, while also delivering operational excellence to our customers and superior growth to our shareholders.

On August 19, 2015, ITC issued a press release announcing that the Board declared a quarterly cash dividend of $0.1875 per share, an increase of approximately 15 percent from the previous quarterly rate of $0.1625 per share. The dividend declaration marked the 10th consecutive year since its initial public offering that ITC had raised the dividend rate on its common stock. The quarterly cash dividend was payable on September 15, 2015 to shareholders of record on September 1, 2015. Quarterly cash dividends of $0.1875 were subsequently declared on November 18, 2015 and February 4, 2016.

On October 1, 2015, the Company announced that it entered into an accelerated share repurchase program ("ASR") with Barclays Bank PLC ("Barclays"). The ASR was entered into pursuant to a Board-approved share repurchase program, which authorized the repurchase of up to $250 million of shares through December 31, 2015. Commenting on the ASR program with Barclays, ITC Chairman, President and CEO Welch stated:

> This program looks to execute up to $115 million of the remaining capacity of share repurchases approved by our board. We remain focused on delivering

Board of Directors
ITC Holdings Corp.
March 8, 2016
Page 3

benefits to customers and creating value for investors, while maintaining the financial strength of the business.

On November 5, 2015, the Company issued a press release announcing its financial results for the third quarter of 2015. ITC reported net income of $65.6 million, or $0.42 per diluted share, as compared to net income of $73.9 million, or $0.47 per diluted share year over year. Operating earnings for the third quarter were $82.3 million, or $0.53 per diluted common share, compared to operating earnings of $73.7 million, or $0.47 per diluted common share year over year. For the nine months ended September 30, 2015, operating earnings were $236.2 million, or $1.51 per diluted common share, compared to operating earnings of $216.1 million, or $1.36 per diluted common share year over year. Commenting on the financial results, ITC Chairman, President and CEO Welch remarked:

> During the third quarter, we continued to execute on our strategy to invest in critical transmission infrastructure, including base and regional capital, while delivering operational excellence at all of our operating companies. We also remain focused on prudent value return as evidenced by the 15% dividend increase this quarter as well as the $115 million accelerated share repurchase program that will be completed by the end of the year.

On February 25, 2016, the Company issued a press release announcing its financial results for the fourth quarter and year ended 2015. For the fourth quarter, ITC reported net income of $37.4 million, or $0.24 per diluted share, compared to net income of $46.7 million, or $0.30 per diluted share year over year. For the year ended December 31, 2015, net income was $242.4 million, or $1.56 per diluted common share, compared to $244.1 million, or $1.54 per diluted common share year over year. Operating earnings for the fourth quarter were $87.6 million, or $0.57 per diluted common share, compared to operating earnings of $75.9 million, or $0.48 per diluted common share year over year. For the year ended December 31, 2015, operating earnings were $323.8 million, or $2.08 per diluted common share, compared to operating earnings of $292.0 million, or $1.85 per diluted common share year over year. Remarking on the financial results, ITC Chairman, President and CEO Welch stated:

> I am very pleased to report that 2015 was another year of strong operational and financial performance. We delivered on our commitments to shareholders and customers while positioning ourselves for continued success in the long-term.

Despite ITC's bright long-term prospects, the Board has entered into the Proposed Transaction to the detriment of the Company and its shareholders. The Merger Consideration is inadequate and significantly undervalues the Company. For example, as recently as February 2, 2016, analyst Jay Dobson at Wunderlich Securities set a $45.00 target price for ITC, which is $0.10 above the $44.90 implied value of the Merger Consideration touted in the joint press release. In an article published on February 10, 2016

Board of Directors
ITC Holdings Corp.
March 8, 2016
Page 4

by *Bloomberg News*, Kellner Management LP fund manager Christopher Pultz stated: "[t]here was anticipation of a higher price." The *Bloomberg News* article also noted that shortly after the Proposed Transaction was announced, ITC closed down 1.9% and Fortis shares slid 10% on the Toronto Stock Exchange.

Importantly, the Proposed Transaction fails to adequately compensate ITC's shareholders for the significant benefits that Fortis will receive from the merger. In the February 9, 2016 joint press release Barry Perry ("Perry"), Fortis's President and CEO stated:

> Fortis has grown its business through strategic acquisitions that have contributed to strong organic growth over the past decade. Our performance in 2015 is a clear demonstration of the success of this strategy. The acquisition of ITC – a premier pure-play transmission utility – is a continuation of this growth strategy. ITC not only further strengthens and diversifies our business, but it also accelerates our growth.

Rather than continuing as a standalone company and allowing Your public shareholders to reap the benefits of the Company's increasingly optimistic prospects and future financial success, You acted for Your own benefit and the benefit of Fortis, and to the detriment of the Company's public shareholders, by entering into the Merger Agreement. You effectively capped ITC's price at a time when the Company was poised to capitalize on its continuing path of success.

Fortis and ITC insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public shareholders. The Board and the Company's executive officers are conflicted and in breach of their fiduciary duties because they will receive unique benefits from the Proposed Transaction not available to Mr. Severance and the other public shareholders of ITC. Specifically, on Fortis' fourth quarter -2015 earnings call on February 18, 2016, Fortis President and CEO Perry stated: "ITC's management team will remain in place and all ITC employees will be retained." Further, the treatment of the Board and management's options, restricted stock and performance shares differs from the treatment public shareholders will receive. Thus, the Board and ITC management was incentivized to pursue a transaction with Fortis in order to continue their positions with the Company.

In addition to the inadequate and unfair Merger Consideration, the Merger Agreement is unfair to ITC and its shareholders since it features several provisions that work to deter – or even preclude – other bidders from stepping forward with a superior alternative offer. At best, these provisions clip ITC's wings in any attempt to maximize the consideration to be paid by an alternative acquirer and, at worst, undermine the independence, disinterestedness, impartiality and loyalty of the Board in the negotiation process.

Board of Directors
ITC Holdings Corp.
March 8, 2016
Page 5

The Merger Agreement impairs the ability of the Board to secure an offer that will adequately capture the true value, financial condition and prospects of the Company and adequately compensates ITC and its shareholders for their ownership interest in the Company. Specifically, section 7.1(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Fortis. Section 7.1(a) also requires the Company to provide Fortis with the identity of any competing bidder and all material terms and conditions of such a proposal. Section 7.1(d) contains a "matching rights" provision that allows Fortis three (3) business days to match any superior offer, plus an additional three (3) business day period following a material amendment to the terms and conditions of a superior offer.

In addition, section 9.2 of the Merger Agreement requires ITC to pay a termination fee of $245 million to Fortis if the Company decides to pursue a competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide shareholders with a superior offer.

In accordance with applicable law, You have a fiduciary duty to act in good faith in controlling, managing, overseeing and directing the business, operations and management of ITC. By reason of Your knowledge, recklessness, gross negligence, and/or negligence as alleged herein, You have failed to act in good faith. As a result, You have violated Your fiduciary duties of care, loyalty, and good faith to ITC's shareholders. In violation of Your fiduciary duties, You have caused ITC to enter into the Proposed Transaction on terms that are detrimental to ITC and its shareholders. Steps must be taken to repair the harm that has been and will be caused to ITC and its shareholders.

We demand on behalf of Mr. Severance that the Board: (i) undertake all appropriate and available methods to maximize shareholder value and remove any conflicts of interest that have clouded the process; (ii) revise the Proposed Transaction as structured in the Merger Agreement to eliminate the preclusive deal protection devices, including, but not limited to, the restrictions on the Board's ability to seek bona-fide offers set forth in Section 7.1 of the Merger Agreement and reduction of the prohibitive termination fee; and (iii) refrain from consummating the Proposed Transaction whereby the Company's public shareholders will receive inadequate consideration for their valuable ITC holdings.

By making this demand, we in no way concede the independence or disinterestedness of ITC's Board. In fact, we submit that, based on the Board's numerous conflicts of interest, entanglements, corporate governance failings, fiduciary breaches, and its direct involvement in voting to approve and/or negotiating the Proposed Transaction, the Board must allow these claims to be pursued on behalf of the Company in a meaningful fashion by our client. This demand is being made, despite the futility thereof, solely pursuant to the requirements of the law of Michigan, which requires such action.

Board of Directors
ITC Holdings Corp.
March 8, 2016
Page 6

    If You would like to discuss any of the matters contained in this letter, we would be pleased to meet with the Board or a committee of the Board.  Please call me at your earliest convenience.

                  Very truly yours,

                  Richard A. Acocelli

cc:    Mr. Harold Severance